[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This memorandum concerns the plaintiff's post-judgment motion for increased support for the parties' child Amanda who presently is 11 years old. The marriage of the parties was dissolved by Judge James P. Doherty on December 1, 1981. The plaintiff's motion relies at least in part upon General Statutes Section46b-215b(b) which makes the Child Support Guidelines an item for consideration in any modification of a support order. The defendant contends that the guidelines are unconstitutional facially and in application.
 I.
The defendant's claim of facial unconstitutionality has two aspects both of which rest upon a supposedly illegal delegation of legislative power to the executive branch of government. One aspect is that the delegation is illegal because of the governor's appointive power over the Commission for Support Guidelines established by General Statutes Section 46b-215a. The defendant's view that all eleven members of the commission are appointed by the governor can only be attributed to a misreading of the statute.
The second aspect is that the delegation of authority, from the legislature to the commission, to review and establish criteria for the guidelines is invalid because it is unaccompanied by sufficient standards. Connecticut jurisprudence, based on Article II of the State's Constitution, has always been that the law-making power is in the legislative branch of government and CT Page 869 cannot be delegated. The General Assembly, however, can enact a law and delegate the power to fill in details to an administrative agency.[1] In order to make such a delegation permissible, it is necessary that the statute enacted declare a legislative policy and establish primary standards for carrying it out or lay down an intelligible principle to which the administrative body must conform. New Milford v. SCA Services of Connecticut, Inc.,174 Conn. 146, 149 (1977); State v. Stoddard, 126 Conn. 623, 627-28
(1940).
Our Supreme Court has stated that the Child Support Guidelines were enacted in response to federal mandates contained in the Child Support Enforcement Amendments of 1984 (Public Law98-378 codified at 42 U.S.C. § 666 et seq.) and The Family Support Act of 1988 (Public Law 100-485, also codified at42 U.S.C. § 666 et seq.). Turner v. Turner, 219 Conn. 703, 714
(1991). The first provision for the establishment of a Commission for Support Guidelines was in Section 8 of Public Act 85-584 which act was entitled "An Act Implementing The Federal Child Support Enforcement Amendments of 1984." The composition of the commission was broadened by Public Act 89-203 Section 1 which is present Section 46b-215a.
A statute is to be judged as a whole and its various points reconciled in order to achieve a reasonable overall interpretation. Peck v. Jacquemin, 196 Conn. 53, 63 (1985). Viewing Public Acts 85-548 and 89-203 in this manner and noting the similarity in language between the latter act and42 U.S.C. § 667, the court concludes that the state legislation adequately meets the requirements for a valid delegation of authority to the commission.
 II.
Unless first amendment freedoms are affected, a situation nonexistent here, the party challenging the constitutionality as applied of a statute must do so on the facts of his particular case. State v. Madera, 198 Conn. 92, 106 (1985). And the same is true for general questions of statutory applicability. See State v. Williams, 206 Conn. 203, 210 (1988). From the evidence presented, the court finds the facts set forth below.
When the marriage was dissolved, Judge Doherty accepted the parties' agreement and incorporated it into the decree. With respect to support for Amanda, the agreement stated that "[t]he defendant shall pay to the plaintiff the sum of $50.00 weekly for child support and shall provide Blue Cross, CMS, or their equivalent for the benefit of said minor child; as provided by his employer." CT Page 870
Other provisions of the agreement placed the child in the plaintiff's custody with the right of reasonable visitation in the defendant; obligated the plaintiff to confer with the defendant on major decisions regarding the child; required the plaintiff to transfer her interest in the marital residence located in Bethlehem to the defendant; required the defendant to release his interest in a savings certificate of the Woodbury Savings Bank to the plaintiff; split a joint account in the Woodbury Savings Bank between the parties; and provided that neither party would make any claim for alimony from the other.
When the judgment of dissolution was entered, the plaintiff was not working and the defendant was employed as a mental retardation aide at the Southbury Training School for a net weekly wage of $196.00. The defendant also reported a weekly wage of $60.00 per week from his own business, Carey Pewter Company.
In 1985, the defendant remarried. His present wife works for the Southbury Training School as a behavior modification specialist. Her salary in 1990 was $30,948.00. There are two daughters of this marriage aged 5 and 1. The defendant's present wife is a co-owner of the family home. She pays the mortgage and nearly all of the bills. The defendant resigned from his position at the Southbury Training School on February 17, 1987. On the date of the resignation, the defendant's annual salary was $19,596.00. From his bi-weekly salary $21.70 was deducted for Blue Cross, CMS and Major Medical coverages for the defendant and dependents. If the defendant had remained in his position, his current salary would be $28,386.00.
The defendant's resignation had nothing to do with job performance. On the records of the Southbury Training School, his work was listed as satisfactory or better. Rather, the defendant terminated his employment voluntarily upon an agreement with his present wife whereby he was to devote time to his two businesses, Carey Pewter Company and Advanced Marine Invironments and to the performance of household duties including child care.
From tax standpoints, neither of the defendant's businesses has operated as a profit. The gross income of Advance Marine Invironments, a vendor of marine supplies, rose from $136.00 in 1988 to $5,432.00 in 1990 but depreciation deductions and other listed expenses consistently turned profits into losses. For Carey Pewter, the gross income ranged from $3,328.00 in 1988 to $1,952.00 in 1990. For each year in this period, gross income was nullified by expenses so that the defendant's pewter-smithy consistently operated at a loss. From the defendant's tax returns, it is difficult to ascertain the basis for the entry in his current affidavit that in 1991 Carey Pewter paid him $80.00 per week.[2]
CT Page 871
Aside from the two miniscule businesses, the defendant received his contributions to the state employees retirement fund in 1987 when he quit his job. Also in 1987, the defendant inherited $11,000.00 from a deceased uncle. In 1986 or 1987, the defendant and a friend each paid $25,000.00 for an ocean front building lot in the Cayman Islands. The defendant's share was paid in part with $10,000.00 he obtained from his mother, in part by the sale of a car for $5,000.00 and in part by $10,000.00 taken from a savings account. The lot is presently for sale at a price of $50,000.00.
In the years since the dissolution of the marriage, the defendant disregarded his agreement and paid very little for Amanda's support. When the plaintiff's motion for increased support was heard, there was an arrearage owed of $10,400.00. The defendant, however, in 1984 and 1989, had purchased United States Savings Bonds in the name of himself and Amanda. At maturity, the bonds will be worth $10,700.00. The bonds formed the source of funds from which the defendant was ordered to liquidate his arrearage.
At present, the plaintiff is employed as a behavior coordinator earning a net weekly wage of $452.32. She and Amanda live with her mother at her mother's house in Naugatuck. Their respective finances are intertwined in that the plaintiff only pays $60.00 per week for rent but buys the food for herself, her mother and daughter at a listed amount of $90.00 per week.
Prominent among the plaintiff's expenses and liabilities are medical, including psychological obligations for Amanda. The plaintiff has insurance to cover much of the medical costs but she testified that the child's unreimbursed medical expenses and medications amount to $30.00 per week. In addition, the child's reaction to certain conduct of the defendant appears to be the principal reason for the debt owned to a psychologist in the amount of $630.00.[3]
 III.
In a proceeding for the modification of a child support award, the Child Support Guidelines are to be considered in addition to and not in lieu of other statutory criteria. General Statutes Section 46b-215b(b). One question to be resolved is whether, for this case, the guidelines are applicable at all. The plaintiff, in an effort to demonstrate that the guidelines are usable has submitted two examples of the defendant's finances. One example combines the defendant's actual income with the salary of his present wife while the other is derived from the defendant's earning capacity. CT Page 872
For the purpose of invoking the Child Support Guidelines, both of the plaintiff's examples are deficient. The defendant's present spouse is not responsible for the child of his former marriage. Her income and her payment of bills are relevant only as they affect the defendant's current expenses and consequently how much of his income should be taken for the support of Amanda. McGuinness v. McGuinness, 185 Conn. 7, 12-13 (1981); Logan v. Logan, 13 Conn. App. 298, 300 (1988); Manaker v. Manaker, 11 Conn. App. 653,655-56 (1987). Further, in the court's view, the guidelines do not serve as an effective criteria where a support order must be predicated upon earning capacity as distinguished from actual earnings. This is especially true here where the defendant's reported income is a weekly amount below the $135.00 set by the Commission for Child Support Guidelines as the noncustodial parent's "self-support reserve" and below the amount normally available for support garnishments pursuant to General Statutes Section 52-362(f).
Since the court considers the plaintiff's reliance on the Child Support Guidelines to be erroneous, there is no need to consider the defendant's claim that that guidelines are unconstitutional as applied to him. See State v. Madera, supra at 106.
 B.
A support order may be modified upon a showing of a substantial change in the circumstances of either party or upon a showing that the final order for child support deviates 15% or more from the Child Support Guidelines. Public Act 91-76 Section 1(a) amending General Statutes Section 46b-86(1). Having ruled that the guidelines are inapplicable, the court must determine whether a substantial change in circumstances has been shown. Fortunately for herself and the child, the plaintiff's circumstances have improved greatly from her unemployed status when the judgment was entered on December 1, 1981. The present proceeding, however, is concerned with whether the defendant's circumstances have also substantially changed. A substantial change in circumstances is one which, in effect, demonstrates that continuance of the original order would be unfair and improper. Noce v. Noce, 181 Conn. 145, 149 (1980).
In the original judgment, the defendant was required not only to pay $50.00 per week but also to supply for Amanda's benefit the medical insurance "provided by his employer." The defendant lost the opportunity for "employer-provided" insurance when he quit his job in 1987 upon an arrangement with his present wife. Ostensibly the arrangement was to enable the defendant to develop his own business as much as it was to permit him to care for their CT Page 873 household and offspring. As such, the defendant's termination of his employment was a substantial change of circumstances. In the meantime, the medical needs of Amanda have increased and are only partially covered by the plaintiff's policy.
A revised support order whereby the defendant would be charged with the plaintiff's unreimbursed medical expenses for Amanda is well within the defendant's earning capacity. A party's earning capacity is a factor for consideration under General Statutes Section 46b-84(b) and may be utilized when, as here, there is specific evidence of that party's previous earnings. Venuti v. Venuti, 185 Conn. 156, 161 (1981); Miller v. Miller,181 Conn. 610, 612 (1980); Paddock v. Paddock, 22 Conn. App. 367, 317 (1990). Contrary to the defendant's suggestion, earning capacity does not mean that he can regain his former job; rather it is an amount that a person can realistically be expected to earn considering his skills, age and health. Lucy v. Lucy, 183 Conn. 230,234 (1981).
The court accepts the plaintiff's testimony and, therefore, finds as a fact that the current unreimbursed medical expenses for Amanda average $30.00 per week. The sum of $20.00 per week is found to be a fair contribution for the child's current psychological expenses. Accordingly, the defendant's weekly payment for Amanda's support is increased from $50.00 to $100.00.
 IV.
The plaintiff has requested $1,500.00 as an attorney's fee for the prosecution of her motion for increased support. This motion, however, was accompanied by others and all excepted this one were settled. The court awards $500.00 to the plaintiff as a reasonable attorney's fee upon consideration of the criteria in Sections 456b-62 and 46b-82. The plaintiff's other request which was for the imposition of a real estate lien is denied.
BARNETT, J.